# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| SHARLENE BATTAGAGLIA, | : | |
| Plaintiff, | : | |
| | | Case No. 3:09CV0189 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Sharlene Battagaglia sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ["DIB"] and Supplemental Security Income ["SSI"] in April 2004, alleging disability since December 15, 2002.  (Tr. 52).  She claims disability due to cervical spondylosis, low back pain, migraine headaches and depression.  (Tr. 58).

After various administrative proceedings, Administrative Law Judge ["ALJ"] Melvin A. Padilla denied Plaintiff's DIB and SSI applications in a

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

decision dated January 22, 2008 (Tr. 11-30), based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (Tr. 29).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9) and supporting Memorandum (Doc. #12); the Commissioner's Memorandum in Opposition (Doc. #16); Plaintiff's reply (Doc. #20); the administrative record; and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits.  At minimum, Plaintiff seeks a remand of this case to the Social Security Administration to correct certain claimed errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff was 34 years old on her alleged disability onset date, and thus was considered to be a "younger person" for purposes of resolving her DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563; 416.963;[2] (*see also* Tr. 28, 52).  She completed the

---

[2]Subsequent citations will identify only one set of the pertinent DIB or SSI Regulations, with full knowledge of the corresponding Regulations.

twelfth grade and trained to become certified to drive a semi-truck.  *See* 20 C.F.R. § 404.1564(b)(4); (*see also* Tr. 28, 58F).  Plaintiff has worked in the past as a truck driver.  (Tr. 293).

At the hearing before ALJ Padilla on February 26, 2007 (*see* Tr. 288-321), Plaintiff testified that she lived in a house with her 16-year-old son and her fiancé.  (Tr. 291).  Her fiancé did most of the driving and paid the bills.  (Tr. 291-92).  Plaintiff last worked in 2002 or 2003 as a truck driver.  (Tr. 293).  Plaintiff said that she no longer could work due to neck pain and "tingling and numbness" in her arms.  (Tr. 294).  Surgery in 2003 followed by physical therapy "helped a little while," but her symptoms "slowly and progressively came back and got a little more intense."  (*Id.*).  Her neck pain, headaches and shoulder numbness grew worse after she was attacked during a robbery in May 2004 and the assailant "was choking me . . . in a choke hold and I felt pain come into my neck."  (Tr. 312-13).  She had tried pain injections and a morphine patch, and was continuing to see a pain management specialist.  (Tr. 294-95).  She also continued to receive massage and physical therapy.  (Tr. 308).

Plaintiff also complained of panic attacks in which "I just lock up . . . There's days where I feel like my heart is just going to pound [out] of my chest.  I have racing thoughts and I'm sweating.  I just, I get lost."  (Tr. 296).  She said that

such episodes occur "on a daily basis now," and can last for "hours at a time."
(Tr. 296).  On cross-examination, Plaintiff clarified that the pounding heart and
hyperventilating symptoms "can last up to 15 minutes," but her behavior
afterward could be affected for hours.  (Tr. 314-15).  She took Valium and
Klonopin for the panic attacks, which "[s]ometimes" helps, "[s]ometimes not."
(Tr. 297).  She had begun seeing a counselor and had seen him "four or five
times."  (Tr. 297-98).  She said that she also experiences "severe mood swings"
that cause her to "lose my cool real easy . . . I blow up, I do screaming, I'm yelling
. . ."  (Tr. 299).

Plaintiff described herself as a recovering alcoholic and addict who drinks
"about every other day."  (*Id.*).  "I could drink probably a six[-] to a 12-pack.  If I
drink liquor . . . I'll drink . . . a half fifth of vodka . . ."  (Tr. 299-300).  She denied
that her drinking or use of pain medications affected her work while she was
employed, although "there might have been a few times that I had a hangover"
and called in sick or late.  (Tr. 300).  She later stated, however, that she had been
let go from her trucking job for alcohol-related absences.  (Tr. 315).  She had been
arrested twice for possession and had a history of crack, cocaine and marijuana
use, but had not used controlled substances for "probably around nine months."
(Tr. 300-02).

Plaintiff claimed to have difficulty sleeping even when using medication. (Tr. 302-03).  She said that she could stand or sit for 10-15 minutes before moving, and felt most comfortable lying back in a recliner.  (Tr. 304).  After her surgery, the surgeon had told her that she could lift 20-25 pounds, but that number was reduced to 10-20 pounds after she was robbed, "due to the stress and . . . the circumstances." (*Id.*).  Climbing stairs left her breathless.  (Tr. 304-05).  She dressed and groomed herself, but did not cook full meals, sweep or mop.  (Tr. 305-06).  She folded laundry and occasionally washed dishes or vacuumed (Tr. 306), but would need to take breaks due to neck pain and "numbness and . . . burning . . . going down my shoulders."  (Tr. 308-09).  She sometimes went grocery shopping with her fiancé, but had stopped attending church when she resumed drinking, and had no visitors or hobbies.  (Tr. 306-07).

Dr. Vanessa Harris also testified at the hearing as a vocational expert ["VE"].  (Tr. 317-20).  Asked about a hypothetical person able to lift up to 30 pounds occasionally; limited to low stress jobs with no fast pace, no production quotas, no dealing with the public, no teamwork, no inherently hazardous or dangerous activities, no contact with alcohol or drugs, no climbing ladders or scaffolds, and no unprotected heights; limited to unskilled, simple tasks not requiring detailed instructions; and allowing for position changes to maintain

comfort; the VE testified that such a person could not perform Plaintiff's past work. (Tr. 317). Nevertheless, she indicated that such a person could perform a significant number of jobs at the medium, light and sedentary exertional levels. (Tr. 318). The VE further stated that her testimony was consistent with the Dictionary of Occupational Titles ["DOT"] except for the variants of alternating positions, simple tasks, and no contact with alcohol or drugs, which her experience indicated could be accommodated by the jobs identified. (Tr. 318-19).

On cross-examination, the VE admitted that medium exertion work requires lifting up to 50 pounds. (Tr. 319). She also admitted that inability to withstand "perceptual stress" involved in a particular job would make an individual unable to perform that job. (Tr. 319-20).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of medical records and the opinions of several medical sources relative to Plaintiff's work-related abilities, summarized as follows.

_Physical Limitations_

Scott C. West, D.O.   Dr. West, a neurosurgeon, began treating Plaintiff on July 14, 2003. (_See_ Tr. 214-15). He reviewed a June 18, 2003 MRI of Plaintiff's cervical spine, which showed degenerative disc disease with the greatest neural

compromise at C5-6 and C6-7. (Tr. 66). Plaintiff's cervical motion and reflexes in her upper back were reduced, sensation was intact, and she had some hand weakness. (Tr. 214).

Dr. West performed cervical spine fusion surgery on Plaintiff on November 26, 2003, due to cervical spondylosis at C4-5, C5-6 and C6-7. (Tr. 69-79). Plaintiff tolerated the procedure well with no complications. (Tr. 73). X-rays of her cervical spine taken on December 15, 2003, and on January 2, 2004, revealed three-level cervical fusion with satisfactory alignment. (Tr. 99, 103).

At a December 3, 2003 follow-up appointment, Dr. West found that Plaintiff did well after surgery. (Tr. 212). Plaintiff denied arm pain. (*Id.*).

On December 19, 2003, Plaintiff reported that she had slipped a week prior and injured her low back. (Tr. 100). Plaintiff had muscle spasm along the low back, normal strength in the lower extremities, and no sensory or reflex deficits. (Tr. 101). At an examination on January 14, 2004, Plaintiff's extremities and reflexes were normal and her neck motion was good. (Tr. 97). Plaintiff's back, bilateral straight leg raising and strength in the lower extremities all were normal. (Tr. 98). X-rays of her lumbar spine taken on January 30, 2004, showed normal findings. (Tr. 92).

On March 10, 2004, Dr. West noted that Plaintiff had done well from a surgical standpoint.  (Tr. 209). Plaintiff reported that her headaches were resolved and her neck pain was decreased, and her x-rays looked good.  (Tr. 209-10).  Dr. West released Plaintiff to return to work with "a permanent 30 pound weight restriction."  (Tr. 209).

CT scans of the spine on March 16, 2004, showed minor degenerative changes at the thoracic and cervical levels, with no significant neural compression and reconstructions with good alignment of the thoracic spine (Tr. 81), and unremarkable findings as to the lumbar spine.  (Tr. 82).  On June 30, 2004, Dr. West noted Plaintiff's complaint of neck problems since being robbed and assaulted two months prior.  (Tr. 206).  The reading of a spinal MRI dated July 8, 2004, was limited by "metal artifacts" from Plaintiff's fusion procedure, but revealed a possible bone spur causing compression at the C5-6 level, with no disc protrusion at the other levels.  (Tr. 186).  Following up on July 23, 2004, Dr. West dismissed the "slight abnormality" that had raised the radiologist's suspicion. (Tr. 205).  He found that Plaintiff's MRIs "looked very good," with "no significant disc herniations or nerve root compression," and he recommended that Plaintiff "continue with conservative care and pain management."  (*Id.*).

<u>Mervet K. Saleh, M.D.</u>  Dr. Saleh, a pain specialist, first examined Plaintiff on March 23, 2004.  (Tr. 148).  At that time, Plaintiff walked with a limp favoring the left lower extremity, could heel and toe walk with mild discomfort, and got on and off the examination table with mild discomfort.  (Tr. 151).  Her cervical spine motion was reduced, thoracic spine motion was normal, and strength in the upper extremities was slightly reduced.  (Tr. 152). Her upper extremities revealed reduced reflexes but no sensory deficits and no atrophy.  (*Id.*).  There was spasm in the shoulders, shoulder motion was reduced, and there was no atrophy or abnormal sensation.  (Tr. 153).  The examination also showed muscle spasm along the lumbar spine, very reduced lumbar motion, slightly reduced strength in the lower extremities, no atrophy, reduced reflexes, and normal sensation. (*Id.*).  Straight leg raising was 40 degrees (90 is normal).  (*Id.*).  The record indicates that Plaintiff thereafter was seen by Dr. Saleh "on a regular basis to monitor her medications, treatments, and her progress."  (Tr. 224).

On October 6, 2004, Dr. Saleh again examined Plaintiff (*id.*), finding diffuse tenderness, muscle spasm along the spine, and decreased cervical and lumbar range of motion.  (Tr. 225).  Straight leg raising was 50 degrees, and strength in all extremities was reduced.  (*Id.*).  Dr. Saleh described Plaintiff's June 2003 cervical spine findings and March 2004 MRI lumbar spine findings. (*Id.*).  Dr. Saleh then

opined that Plaintiff was "totally disabled" due to her physical condition and pain, combined with her age, education and background. (Tr. 225-26).

Phillip A. Edwards, D.O.[3] Dr. Edwards of Orthopedic Associates, Inc. saw Plaintiff for complaints of lower back and hip pain, primarily on the right side, on October 13, 2004. (Tr. 229). Plaintiff had good range of motion in her hips and her hip joints looked good on x-ray. (*Id.*). Bilateral straight leg raising was normal. (*Id.*). X-rays did reveal some "very minor" osteophytosis and minor facet joint changes. (*Id.*). Dr. Edwards diagnosed lumbosacral strain with possible facet syndrome. (*Id.*). He recommended an EMG and nerve conduction study (*id.*), which eventually was conducted on July 13, 2005. (Tr. 235-36). That study indicated "cervical nerve root irritation on the right" at the C1 level, and "mildly carpal tunnel syndrome bilaterally." (Tr. 235).

Robert F. Linn, D.O. The record suggests that Dr. Linn, a family practitioner, was Plaintiff's primary care physician between October 21, 2004 and August 31, 2006. (*See* Tr. 232-40). An October 21, 2004 CT scan of Plaintiff's cervical spine ordered due to pain symptoms showed no disc herniation; postoperative changes from C4 to C7; spurring at C6 which "mildly efface[d] the adjacent thecal sac," and arthritis at C5-6 with "very slight encroachment" on the

---

[3]Incorrectly identified in Respondent's opposing memorandum as Dr. "Edmunds." (Doc. #16 at 5; *see* Tr. 228).

right neural foramen. (Tr. 240). Lumbar spine x-rays on July 15, 2005, were normal. (Tr. 234).

In a letter dated August 22, 2005, Dr. Linn opined that Plaintiff was "unemployable" due to "multiple medical problems including severe degeneration of her cervical spine with cervical radiculopathy" and "bilateral carpal tunnel syndrome." (Tr. 233). Dr. Linn "d[id] not foresee her being able to resume any gainful employment in the future." (*Id.*).

Subsequent diagnostic test results also appear in the record. A cervical spine CT scan apparently performed on August 31, 2005 (Tr. 277; *see also* Tr. 232) showed postoperative findings with "residual central lateral recess and foraminal encroachment at C5-6 and C6-7 level with cord and right exiting nerve root compromise." (Tr. 278). A cervical spine MRI on March 24, 2006, also showed postoperative evidence from C4 to C7, as well as "minimal degenerative anterolisthesis" of C3 on C4. (Tr. 237).

Jeffrey S. Rogers, D.O. Dr. Rogers saw Plaintiff on September 26, 2006, to assess her pain symptoms and treatment. (*See* Tr. 253). Reflexes in the lower extremities were intact, with no motor or sensory deficits. (Tr. 254). Cervical range of motion was reduced due to pain. (*Id.*). Dr. Rogers recommended cervical epidural steroid injections (*id.*), and performed a series of them through

-11-

October 19, 2006. (Tr. 252). Afterward, however, Plaintiff still reported her pain "as a 9 [out of] 10." (Tr. 251). By January 2007, Plaintiff had moved to another pain management center for treatment. (*Id.*).

Avni Arora, M.D. Dr. Arora apparently treated Plaintiff a few times between December 2006 and January 2007 at an outpatient clinic. (*See* Tr. 255-60). Notes dated December 21, 2006, reflect that Plaintiff complained of neck pain and claimed to have received "no benefit" from Dr. Rogers' epidural injections. (Tr. 258). On January 4, 2007, Plaintiff reported that she couldn't tell if a cervical epidural received the previous day was working. (Tr. 256-57). She also complained of "[a]nxiety, depression, insomnia, and no desire to continue living." (Tr. 256). Dr. Arora prescribed Klonopin "till she sees a psychiatr[i]st." (Tr. 257).

Suresh Gupta, M.D. Dr. Arora referred Plaintiff to Dr. Gupta, a surgeon, for treatment of neck pain due to "failed neck syndrome," apparently beginning in January 2007. (*See* Tr. 264). Dr. Gupta administered cervical epidural steroid injections for pain on January 2, 2007 (Tr. 262) and on January 15, 2007. (Tr. 261). Treatment notes reflect that Plaintiff reported on January 9, 2007 that her neck was "still very painful," more on the right than on the left, and continued to report stiffness on January 23, 2007. (Tr. 264).

-12-

Stephen W. Duritsch, D.O.  Dr. Duritsch, a rehabilitation specialist,

examined Plaintiff on November 15, 2006, at the request of the Ohio BDD.  (Tr.

241).  Plaintiff reported that she lived alone and took care of her own activities of

daily living.  (*Id*.).  Dr. Duritsch observed that Plaintiff moved easily and freely,

and got on and off the examining table without difficulty.  (Tr. 242). Cervical

spine and dorsolumbar spine motion was reduced, but motion of all extremities

and bilateral straight leg raising was normal.  (Tr. 242, 245-47).  Strength in all

extremities was reduced, but there was no atrophy.  (Tr. 242) .  There was

decreased sensation in the left extremities, and reflexes in all extremities were

reduced.  (Tr. 242).

Dr. Duritsch termed "inconsistency" the "hallmark" of Plaintiff's exam.

(Tr. 242).  Due to that "physiological inconsistency and poor effort," Dr. Duritsch

was unable to make any objective findings that would support restrictions for

lifting, carrying, standing, walking, sitting, or other physical functions.  (Tr. 242).

Dr. Duritsch completed a form indicating that Plaintiff's ability to do physical

work-related activities was not affected by her impairment.  (Tr. 248-49).

*Psychological Limitations*

Deborah Wong, Ph.D.  Dr. Wong treated Plaintiff through the Miami

County Recovery Council from July 2003 to at least September 2004.  (*See* Tr. 216).

She found that Plaintiff was focused and conversant, with a "bright" affect and positive mood unless experiencing pain.  (Tr. 220, 216).  Plaintiff was oriented and had no thought disorder.  (*Id.*).  Plaintiff reported "stress related" memory loss, but had insight into her chemical dependency and need for treatment.  (*Id.*).  In August 2004, Dr. Wong opined that Plaintiff could remember, understand and follow instructions; could do simple, routine and repetitive tasks; and could maintain attention and concentration, with "breaks" from physical tasks.  (Tr. 221).  Dr. Wong's opinion remained essentially unchanged in January 2005.  (Tr. 216-17).

Alan R. Boerger, Ph.D.  Dr. Boerger, a clinical psychologist,  examined Plaintiff on June 8, 2004, at the request of the Ohio Bureau of Disability Determination ["BDD"].  (*See* Tr. 162-67).  Plaintiff described herself as a recovering alcoholic and a victim of abuse, with a variety of physical problems.  (Tr. 162-63).  She stated that she had not worked since December 2002, when she was laid off from her job as a truck driver.  (Tr. 163).  Plaintiff was "very verbal," and her speech and thought processes were appropriate, relevant and coherent.  (Tr. 164).  Her affect was appropriate to the situation (*id.*), and she was alert and oriented.  (Tr. 165).  Plaintiff reported feelings of hopelessness and suicidal thoughts, panic attacks, and declining memory.  (Tr. 164-65).

Plaintiff reported that she tried to do housework, had two large dogs who were "too much to take care of," went to church, and rarely shopped.  (Tr. 166). Dr. Boerger diagnosed Plaintiff as suffering from dysthymic disorder, post-traumatic stress disorder ["PTSD"] and alcohol dependence in remission, and assigned her a Global Assessment of Functioning ["GAF"] score of 51.  (*Id.*).  He found that Plaintiff's ability to understand and follow instructions was mildly impaired; her ability to maintain attention to perform simple repetitive tasks was mildly to moderately impaired; her ability to relate to others was moderately impaired; and her ability to withstand the stress and pressures of day-to-day work was moderately to markedly impaired.  (Tr. 167).

David W. DeMuth, M.D.  Dr. DeMuth, a state agency psychiatrist, reviewed Plaintiff's medical record in July 2004.  (Tr. 188-203).  He concluded that Plaintiff had mild restrictions in the activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence or pace; and no episodes of decompensation.  (Tr. 198).  He opined that Plaintiff could do simple work tasks and could interact with coworkers on a superficial basis, but would have difficulty with jobs that require frequent changes in pace.  (Tr. 203).

Bonnie L. Katz, Ph.D.  Dr. Katz, a state agency clinical psychologist, also reviewed Plaintiff's file, in December 2004.  (*See id.*).  She affirmed Dr. DeMuth's findings.  (*Id.*).

John Wade, Psy. D.  Psychologist Dr. Wade began treating Plaintiff in January 2007.  (Tr. 271).  His initial assessment notes suggest that Plaintiff had bipolar disorder that had gone "untreated for at least six months," and that she had a history of buying pain medication ["Xanax"] "on [the] street" nine months earlier.  (*Id.*).  She presented with complaints of neck, arm and lower back pain following back surgery.  (Tr. 271-72).  Dr. Wade noted that she appeared anxious, depressed and tearful at that first meeting, but displayed coherent and relevant thoughts, good judgment, and fair insight.  (Tr. 275).

On January 11, 2007, Plaintiff reported being "on an emotional roller[ ]coaster."  (Tr. 270).  She was cooperative, tearful and verbal; her affect and thought process were congruent with her mood; and she was depressed and anxious.  (Tr. 268-70).  Her affect and mood were unchanged on January 15, 2007, when Plaintiff indicated a desire "to get into a routine with her treatment here," and concern about "some OCD [obsessive compulsive] thoughts and behavior." (Tr. 269).  Progress notes remained largely consistent on January 23, 2007, when Plaintiff mentioned the earlier robbery as continuing to cause her fear, and

expressed an interest in getting Dr. Arora to "prescribe something" for her.  (Tr. 268).  There is nothing in the record evidencing further treatment with Dr. Wade.

## III.  THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.  Applicable Standards

The Social Security Administration provides benefits to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  An applicant bears the ultimate burden of establishing that he or she is under a "disability." *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  (*See* Tr. 13-15); *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.      The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the insured status requirements of the Act through March 31, 2008. (Tr. 15). The ALJ also found that Plaintiff had not engaged in substantial gainful activity since December 15, 2002. (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of residuals of cervical fusion, a history of substance abuse with continuing alcohol abuse, dysthymia, and an anxiety disorder. (*Id.*). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that

meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 22).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity ["RFC"] to perform work activities subject to these limitations: lifting no more than 30 pounds occasionally; must be permitted to alternate positions as needed; no climbing of ladders or scaffolds, or work at unprotected heights; no inherently hazardous or dangerous activities; limited to low stress jobs that are not fast-paced, have no production quotas, and do not involve teamwork or dealing with the general public; and no jobs in contact with alcohol or drugs as part of her job duties.  (Tr. 23).  With those restrictions, the ALJ then found that Plaintiff could not perform her past relevant work.  (Tr. 28).

Nevertheless, the ALJ found at Step 5 that Plaintiff remained capable of performing jobs that existed in significant numbers in the national economy. (*Id.*).  This assessment, along with the ALJ's findings throughout his sequential evaluation, ultimately led him to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI benefits.  (Tr. 29).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are

supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a

claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*,

582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v.*

*Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.   DISCUSSION

### A.     The Parties' Contentions

Plaintiff's Statement of Errors (Doc. #9) raised three distinct challenges to

the ALJ's decision, stated *verbatim* as follows, in their entirety:

> 1.  In reaching his conclusions regarding the limitations imposed by [Plaintiff's] mental impairments, the [ALJ] improperly relied upon only selected portions of the findings and conclusions of the consultative examining psychologist, Dr. Boerger, ignoring other findings and conclusions that were favorable to the claimant without explanation founded in substantial evidence.

> 2.  The ALJ's hypothetical question to the [VE] was not supported by substantial evidence, based upon a full and fair consideration of the record as a whole; therefore, he improperly and impermissibly relied upon the VE's answers to his hypothetical question.

> 3.  Where, without explanation grounded in substantial evidence, the ALJ neglected to include in his hypothetical question to the VE an *uncontradicted* and pivotal mental limitation, the VE's answer to the hypothetical cannot rise to the level of substantial evidence to support the ALJ's denial of benefits.

(*Id.* at 1-2) (emphasis in original) (citations omitted).

Although Plaintiff's contentions as thus stated appear to invoke the ALJ's findings only as to her <u>mental</u> limitations (*see id.*), her supporting memorandum introduces additional challenges to the ALJ's findings regarding her <u>physical</u> limitations. (*See* Doc. #12). In particular, Plaintiff protests the ALJ's handling of Dr. West's opinion (*see id.* at 3-5), and while mentioning the opinions of Drs. Saleh, Linn,[4] Rogers, Arora and Gupta (*see id.* at 5-8), articulates specific additional objections only to the handling of Drs. Saleh's and Linn's opinions. (*Id.* at 7-8). The ALJ's physical limitation analysis remains the focus of Plaintiff's reply (*see* Doc. #20 at 1-4, 5-6), which also criticizes the ALJ's handling of Dr. Duritsch's opinion. (*Id.* at 6-7). Indeed, the mental limitation challenges raised in Plaintiff's Statement of Errors (*see* Doc. #9) consume the minority of Plaintiff's supporting memorandum and reply, which make only fleeting references to Plaintiff's psychological restrictions as opined by Dr. Boerger and Dr. Wade. (Doc. #12 at 2-3, 9-12; Doc. #20 at 4-5).

In opposing Plaintiff's contentions, the Commissioner argues that substantial evidence supports the ALJ's conclusion that Plaintiff remained able to perform a significant number of jobs. (Doc. #16 at 10-20). He contends that the ALJ properly gave controlling weight to Dr. West's opinion, and reasonably

---

[4]Incorrectly identified in Plaintiff's memorandum as Dr. "Lynn." (Doc. #12 at 5; *see* Tr. 233).

discounted the opinions of Drs. Saleh and Linn as lacking corroboration and being inconsistent with other evidence. He also urges that the ALJ reasonably relied on Dr. Duritsch's opinion regarding Plaintiff's mental limitations, and reasonably rejected Dr. Wade's contrasting opinion as unsupported. Finally, the Commissioner asserts that the ALJ's hypothetical question to the VE adequately incorporated all of Plaintiff's limitations that were substantiated by the evidence, and thus was proper.

### B.  Medical Source Opinions

#### 1.  *Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle that greater deference generally is given to the opinions of treating medical sources than to the opinions of non-treating medical sources. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. § 404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations . . ." 20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must grant controlling weight to a treating source's

-23-

opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; see *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] . . . or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected . . .

Social Security Ruling 96-2p, 1996 WL 374188, at *4. The Regulations require the ALJ to continuing the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

2.    *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180, at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id*., at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency and specialization.  *See* 20 C.F.R. § 404.1527(f); *see also* Ruling 96-6p, at *2-*3.

**C.    Analysis**

In determining whether a claimant is disabled, an administrative law judge makes a residual functional capacity determination.  That finding is an "assessment of the claimant's remaining capacity for work" once his or her limitations have been taken into account.  20 C.F.R. § 416.945.  It is "a more complete assessment of [his] physical and mental state and should include an 'accurate portray[al] [of his] individual physical and mental impairment[s].'"

*Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (citing *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987); *Myers v. Weinberger,* 514 F.2d 293, 294 (6th Cir. 1975) (*per curiam*)).

### *Physical Impairments*

Here, the ALJ stated outright that his finding that Plaintiff retained a physical RFC for a reduced range of medium work was based "primarily on Dr. Duritsch's clinical findings, and Dr. West's release of his patient to return to work in March 2004." (Tr. 23). He noted that Dr. Duritsch characterized Plaintiff's examination as "inconsistent" due to "poor effort," and that Dr. West recommended a permanent 30 pound weight restriction post-surgery, with no indication that he later decreased that amount. (*Id.*). ALJ Padilla specifically rejected the state agency consultants' RFC finding for only light exertional work, deeming it inconsistent with Dr. West's 30 pound weight limitation. (Tr. 24). He also discounted Dr. Linn's opinion that Plaintiff was "unemployable," because Dr. Linn "provide[d] no clinical findings to support his opinion;" as well as Dr. Saleh's opinion that Plaintiff was totally disabled, because "[t]here is no evidence . . that Dr. Saleh treated [Plaintiff] after October 2004," and because Dr. Saleh considered Plaintiff's "age, education and background" without "establishing her expertise or certification in these areas." (Tr. 25).

Plaintiff argues that the ALJ's reliance on Dr. West's March 2004 opinion was improper in light of evidence indicating that Plaintiff suffered post-surgical spinal injuries both in a "slip and fall" accident in December 2003, and during a robbery in May 2004.  (Doc. #12 at 3-4).  Although Plaintiff asserts that both of these incidents "occurred *after* Dr. West had already released [Plaintiff] to return to work with a 30-pound weight restriction" (*id.* at 4) (emphasis in original), both the record and Plaintiff's own memorandum contradict her implication that Dr. West's recommendation thus no longer applied.  Regardless of when Dr. West first released Plaintiff to return to work, he continued to recommend that she be subject to a "permanent 30 pound weight restriction" in his opinion issued on March 10, 2004 (Tr. 209), or nearly three months <u>after</u> Plaintiff reported having slipped and hurt her back in December 2003.  (Tr. 100-01); (*see also* Doc. #12 at 3-4).  In a letter dated January 26, 2004, Dr. West indicated that Plaintiff still was under his care, and that she was "scheduled for her 4-month post op visit on 3/01/04." (Tr. 211).  Apparently nothing reported or seen on March 1, or during Plaintiff's exam on the date that the opinion was issued, dissuaded Dr. West from his March 10, 2004 opinion that a 30 pound weight limitation remained appropriate.  (Tr. 209).  The ALJ thus did not err by failing to assume that Plaintiff's December 2003 accident would alter Dr. West's March 2004 opinion.

As to Plaintiff's testimony that her back was injured during a later robbery attempt, the ALJ's decision stated as follows:

> [Plaintiff's] attorney, referring to a sheriff's report dated six months after surgery, asked his client if this is when she started getting worse, and she agreed with counsel, saying that she was attacked and robbed coming out of [a] gas station. She claimed that since then, the neck and shoulder pain became worse, and the numbness started coming back. When asked by her attorney why she did not report the incident until a few days later, she alleged that she was afraid.

(Tr. 14); (*see also* Tr. 311-13).

Although ALJ Padilla's decision did not further analyze Plaintiff's allegations of injury during the robbery, it is interesting to note that her hearing testimony about that incident included the following exchange:

> [Plaintiff's attorney]: During that time or right after that attack[,] did your symptoms grow significantly worse as far as your neck and arm pain were concerned?
>
> [Plaintiff]: Yes.
>
> [Plaintiff's attorney]: Did you report that to any doctor?
>
> [Plaintiff]: I did.
>
> [Plaintiff's attorney]: Do you remember who?
>
> [Plaintiff]: <u>Dr.</u> <u>West</u>.

(Tr. 312) (emphasis added).

Dr. West's office records also confirm that Plaintiff complained in June 2004 of neck problems that she attributed to being robbed and assaulted. (Tr. 206). Nevertheless, on July 23, 2004, Dr. West found that Plaintiff's MRIs "looked very good," with "no significant  disc herniations or nerve root compression," and he recommended that Plaintiff "continue with conservative care and pain management." (Tr. 205).

As noted *supra*, among the reasons given by ALJ Padilla for his physical RFC finding was that fact that "[t]here is no objective medical evidence establishing that Dr. West decreased the weight restriction at a later date." (Tr. 23). That statement takes on additional significance in light of the evidence that Dr. West was made aware of Plaintiff's post-robbery complaints (Tr. 312, 206), but still made no downward adjustment in his weight-bearing recommendations for Plaintiff – indeed, the record shows that he recommended only that Plaintiff continue to be treated conservatively. (Tr. 205). As such, the ALJ cannot be said to have erred by relying on Dr. West's opinion without devoting further discussion to the alleged aggravation of Plaintiff's symptoms in a robbery.

Plaintiff further argues that the ALJ erred by refusing to give "controlling, or even great, weight" to the opinions of treating physicians Dr. Saleh and Dr. Linn. (Doc. #12 at 7) (quoting Tr. 25). In so doing, ALJ Padilla cited 20 C.F.R. §§

404.1527 and 416.927 and the factors applicable under the treating physician rule, and found that Drs. Saleh's and Linn's opinions "failed on points 2 and 3," *i.e.*, that they were not "well-supported by medically-acceptable clinical and laboratory diagnostic techniques," and were "inconsistent with other substantial evidence in the case record." (Tr. 25).

The ALJ did not err in that regard. In the first instance, Dr. Saleh's opinion that Plaintiff was totally disabled and Dr. Linn's opinion that Plaintiff was "unemployable" clearly were at odds with Dr. Duritsch's opinion that Plaintiff's ability to do physical work-related activities was not affected by her impairment (Tr. 248-49), and with Dr. West's opinions that Plaintiff could return to work with only a 30 pound weight restriction (Tr. 209) and needed only "conservative care." (Tr. 205). The treating physician rule therefore did not apply to entitle those opinions to controlling weight.

In addition, the ALJ's further discussion of Drs. Saleh's and Linn's opinions makes clear that he continued to consider them in light of other appropriate factors – namely, the length, frequency, nature and extent of the treatment relationship; supportability; consistency; and specialization, *see Rogers*, 486 F.3d at 242; *Wilson*, 378 F.2d at 544 – in reaching his conclusion that those opinions were not entitled to significant weight. For instance, ALJ Padilla noted

that Dr. Saleh apparently had treated Plaintiff only from March 2004 through October 2004, and that she had not shown that she was qualified to issue a disability opinion that took into account not merely Plaintiff's physiological condition but also her "age, education and background." (Tr. 25). As to Dr. Linn, the ALJ specifically observed that his specialty was in family practice, and that his opinion was not supported by clinical findings. (*Id.*). As he applied the appropriate legal standards and his conclusions are supported by substantial evidence in the record, the ALJ did not err in his evaluation of those treating source opinions. This Court thus cannot overturn the decision on that basis.

<u>*Mental Impairments*</u>

Plaintiff also argues in a more cursory fashion that the ALJ erred by relying on only those portions Dr. Boerger's psychological consultative report that were favorable to the Commissioner, and by relying on the VE's answer to a hypothetical question that omitted "an *uncontradicted* and pivotal mental limitation" suffered by Plaintiff. (Doc. #9 at 1-2) (emphasis in original). Her later memorandum clarifies that her objection is to the hypothetical question's alleged failure to incorporate a limitation reflecting Dr. Boerger's opinion that Plaintiff is moderately to markedly limited in her ability to withstand the stresses of day-to-day work activity (Doc. #12 at 2-3), and Dr. Wade's assignment of a GAF score of

49.  (*Id.* at 10-12).  Defendant counters that the ALJ was not required to ask the VE to consider "unsubstantiated difficulties" that Plaintiff claims to experience. (Doc. #16 at 18).

ALJ Padilla's decision demonstrates that he affirmatively recognized that Dr. Boerger had found that Plaintiff's "ability to withstand the stress and pressures associated with daily work activity was moderately to markedly impaired."  (Tr. 24).  He also noted, however, that the state agency consulting sources in essence found that Plaintiff was capable of carrying out simple work tasks "so long as she interacted with coworkers on no more than [a] superficial basis" and any jobs assigned did not require "frequent changes in pace."  (Tr. 25). In assessing the degree of functional limitations that resulted from Plaintiff's mental impairments, then, he found that those limitations could be accommodated by restricting Plaintiff to performing work that was low stress, simple and not fast paced, with no production quotas, teamwork, or dealing with the public.  (Tr. 22-23, 24-25).

Based on the record before the Court, the ALJ's conclusion to that effect appears to be supported by substantial evidence, including the opinions of treating psychologist Dr. Wong (Tr. 221, 216-17) and state agency psychiatrist and psychologist Dr. DeMuth and Dr. Katz.  (Tr. 188-203).  Conversely, Plaintiff

has directed the Court to no specific evidence, including the opinions of Dr.

Boerger and Dr. Wade, definitively indicating that the work restrictions imposed

by the ALJ are insufficient to accommodate Plaintiff's substantiated mental

impairments.

       **IT THEREFORE IS RECOMMENDED THAT:**

           1.      The Commissioner's final non-disability decision
                   be AFFIRMED;

           2.      The case be TERMINATED on the docket of this
                   Court.

July 7, 2010                                   ___s/Sharon L. Ovington_____
                                            Sharon L. Ovington
                                 United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).